**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**at LONDON**

**CIVIL ACTION NO. 13-84-DLB**

**PACER MANAGEMENT OF KENTUCKY, LLC, et al.**                    **APPELLANTS**

**vs.**                    **MEMORANDUM OPINION AND ORDER**

**KNOX COUNTY, KENTUCKY, et al.**                    **APPELLEES**

********************

Pacer Management appeals a partial grant of summary judgment in favor of Knox County Hospital. The bankruptcy court held that the parties' Settlement Agreement awarded supplemental Medicare/Medicaid payment to Knox County Hospital. Pacer argues that the court misinterpreted the agreement and therefore improperly awarded the payment to Knox County Hospital. The parties having filed their respective briefs, this appeal is ripe for decision.

**I.       Factual and Procedural Background**

In December 2006, Appellant Pacer Health Management Corporation (hereinafter "Pacer") entered into a Hospital Operating Lease Agreement (hereinafter "Lease") with Knox County, Kentucky and Knox Hospital Corporation (hereinafter "the Knox Parties"). (Doc. # 1-3 at 2). Pursuant to this Lease, Pacer and its affiliates managed Knox County Hospital (hereinafter "Hospital") for five years. (*Id.*). In October 2011, the Knox Parties notified Pacer that it had defaulted on the Lease. (*Id.*). Despite numerous negotiations, the parties were unable to resolve this dispute, prompting the Knox Parties to file suit in

1

Knox Circuit Court.  (*Id.*).  Pacer filed its bankruptcy petition shortly thereafter.  (*Id.*).

After the bankruptcy court permitted Pacer to reject the Lease, the parties entered into a Settlement Agreement (hereinafter "Agreement").  (*Id.*).  This Agreement provided that the Knox Parties would assume responsibility for Hospital operations on July 16, 2012 (hereinafter "Transition Date").  (*Id.* at 3).  The Knox Parties would also own all post-Transition Date assets.  (Bk. Doc. # 238 at 24).  Section 4(b) of this Agreement allocated pre-Transition Date assets in the following manner:

> [Pacer] shall have and retain exclusive ownership of any and all rebates, refunds, incentives or similar payments which were earned or which accrued but were not paid prior to the Transition Date, *provided however that this provision shall not include any credit for underpayment of Medicare/Medicaid reimbursements, if any.* The Knox County Parties shall promptly deliver to the Debtors any payments received on account of such accounts receivable, rebates, refunds, incentives or similar payments.

(emphasis added) (*Id.* at 23).  Section 4© further stated that Pacer:

> shall have exclusive ownership of all accounts receivable from all Medicare/Medicaid payors existing or to be generated for services provided prior to the Transition Date.

(*Id.*).

The Agreement does not expressly address ownership of a Disproportionate Share Hospital Payment (hereinafter "DSH Payment"), which supplements regular Medicare/Medicaid reimbursements to hospitals that serve a high proportion of indigent patients.  (Doc. # 1-3 at 3).  In fall 2012, the Kentucky Cabinet for Health and Family Services, Department of Medicaid Services, made such a Payment to the Hospital, totaling $466,453.00.  (*Id.*).  Although the Payment was made well after the Transition Date, the amount of the Payment was calculated using patient care data collected before the Transition Date.  (*Id.*).  Both parties claim ownership of this asset under the terms of the

2

Settlement Agreement.  (*Id.*).

## II.     Analysis

### A.     Standard of Review

On appeal, the district court "may affirm, modify or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings."  Fed. R. Bankr. P. 8013.  While findings of fact will not be set aside unless clearly erroneous, conclusions of law are reviewed de novo.  *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 88 (6th Cir. 1993).  A bankruptcy court's decision to grant summary judgment is purely a question of law and is therefore subject to *de novo* review.  *Id.*  Under a *de novo* standard of review, "the reviewing court decides an issue independently of and without deference to, the trial court's determination."  *Menninger v. Accredited Home Lenders (In re Morgeson)*, 371 B.R. 798, 800 (B.A.P. 6th Cir. 2007).

### B.     Evaluating the Partial Grant of Summary Judgment

#### 1.     The Summary Judgment Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056.  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When a party files a properly supported motion for summary judgment, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  If both parties file cross-motions for summary judgment, then "the Court must evaluate each party's motion on its own merits, taking care

3

in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

### 2.    Interpreting the Settlement Agreement

A settlement agreement "is essentially a contract subject to rules of contract interpretation." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002).   Generally, contract interpretation is a question of law for the Court and only becomes a question of fact if the court determines that the contract is ambiguous.  *Id.*  If no ambiguity exists, then "the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence." *Id.* at 385.

Since the parties agreed that the Agreement was unambiguous, the bankruptcy court focused its efforts on determining whether that Agreement awarded the DSH Payment to Pacer as an account receivable or miscellaneous payment that accrued pre-Transition Date, or whether it assigned the Payment to the Knox Parties as a credit for underpayment of Medicare/Medicaid reimbursements.  (Doc. # 1-3 at 6).  An inquiry into the interpretation of a contract such as this one is purely a legal question, so the bankruptcy court properly determined that there was no genuine issue of material fact to preclude a grant of partial summary judgment.  (*Id.*).

### C.    Allocating the DSH Payment

The Settlement Agreement does not expressly allocate the DSH Payments to either party.  (Doc. # 1-3 at 4).  It only specifies that Pacer

> ...shall have and retain exclusive ownership of any and all rebates, refunds, incentives or similar payments which were earned or which accrued but were not paid prior to the Transition Date, provided however that this provision shall not include any credit for underpayment of Medicare/Medicaid

4

> reimbursements, if any. The Knox Parties shall promptly deliver to the Debtors any payments received on account of such accounts receivable, rebates, refunds, incentives or similar payments.

(*Id.*). While a reading of this clause alone indicates that the parties reserved Medicare/Medicaid assets to the Knox Parties, the following clause also states that Pacer

> ...shall have exclusive ownership of all accounts receivable from all Medicare/Medicaid payors existing or to be generated for services provided prior to the Transition Date

(*Id.*). The tension between these clauses is the source of the current dispute. Pacer seeks to characterize the Payment as a pre-Transition date "account receivable from Medicare/Medicaid payors" or "payment which [was] earned or accrued but...not paid prior to the Transition Date," while the Knox Parties maintain that it is a "credit for underpayment of Medicare/Medicaid reimbursements" because it provides additional funds for hospitals that serve a high proportion of low-income patients. (Docs. # 5 and 6). Both parties' arguments imply that the DSH Payment corresponds to pre-Transition Date assets because the clauses they rely on do not speak to post-Transition Date assets. (*Id.*). However, the Knox Parties' argument that the Payment is intended to subsidize Hospital operations for the upcoming Fiscal Year suggests that the funds may actually correspond to post-Transition Date activities. (*Id.*). To determine which clause of the Settlement Agreement should control, the Court must determine whether the DSH Payment corresponds to pre-Transition Date or post-Transition Date activities.

A basic review of the Medicare/Medicaid system is helpful in evaluating how the payments should be allocated. The federal Medicare program "pays hospitals a prospectively determined amount per discharge based on the costs that an efficiently operating hospital should incur to provide quality services to Medicare beneficiaries based

5

on the patient's diagnosis at the time of discharge." *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 272 (6th Cir. 1994); *see also* 42 U.S.C. § 1395ww.  This so-called "Prospective Payment System" uses pre-set payment schedules to determine in advance how much participating hospitals will be reimbursed for services provided.  42 U.S.C. § 1395ww.  If the actual cost of providing those services falls below the amount of reimbursement, the hospital keeps the difference.  If, however, the provider's actual cost exceeds the amount of reimbursement, then the hospital absorbs the loss.  *Id.*

In an effort to address this problem, Congress created the Disproportionate Share Program "to provide and supplement the resources available to those hospitals serving low-income patients."  *Jewish Hosp., Inc.,* 19 F.3d at 275 (6th Cir. 1994).  To determine whether a hospital is entitled to a DSH Payment, and if so, how much it should receive, the Secretary of Health and Human Services makes calculations using Medicare and Medicaid patient care data collected from the hospital for a specified reporting period from the prior Federal Fiscal Year.  *See Metro. Hosp. v. U.S. Dep't of Health & Human Servs.*, 712 F.3d 248, 250-53 (6th Cir. 2013); *see also* 42 U.S.C. § 1395(d)(5)(F)(vi)(II).

Congress also implemented a joint federal-state endeavor, known as Medicaid, that provides financial assistance to low-income individuals seeking medical care.  *See Markva v. Haveman*, 317 F.3d 547, 550 (6th Cir. 2003); *see also* 42 U.S.C. § 1396 *et seq.*  States receive federal funds to administer their own Medicaid plans, provided they comply with the requirements of the federal Act and its accompanying regulations.  *Id.*  Like many states, Kentucky has incorporated a Disproportionate Share Hospital Payment, similar to that implemented in the federal Medicare program, into its Medicaid program.  *See* Ky. Rev. Stat. Ann. § 205.520 *et seq.* (creating the Kentucky Medical Assistance Program with the

6

intent to "comply with the provisions of Title XIX of the Social Security Act"); *see also* Ky. Rev. Stat. Ann. § 205.640 (creating the Medical Assistance Revolving Trust Fund "to compensate acute care hospitals, private psychiatric hospitals, state mental hospitals, and university hospitals participating in the disproportionate share program for uncompensated service provided by the hospitals to individuals and families with total annual incomes and resources up to one hundred percent of the federal poverty level").

It is not immediately clear from the bankruptcy court's Memorandum Opinion and Order or the parties' briefing whether the DSH Payment at issue is associated with Medicare, Medicaid or both.  Regardless of the Payment's source, the Court reaches the same conclusion.  Based on its examination of both Medicare and Medicaid law, the Court finds that the DSH Payment corresponds to post-Transition Date activities, and therefore belongs to the Knox Parties under the terms of the Settlement Agreement.

Although the Medicare statute does not specifically state whether the DSH Payment corresponds to the prior Federal Fiscal Year or the current one, Congress clearly conceived DSH Payments as a supplement to Medicare's Prospective Payment System that would help qualifying hospitals face the higher costs incurred in serving a high proportion of indigent patients.  *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 272 (6th Cir. 1994); *see also* 42 U.S.C. § 1395ww.  Unlike regular Medicare reimbursements, which correspond to specific services provided, the DSH Payment is calculated by entering Medicare/Medicaid patient data from the prior Federal Fiscal Year into a formula set by Congress.  The Payment itself is then dispersed at the beginning of the current Federal Fiscal Year, further indicating an intent for the Payment to subsidize hospital operations during that period.

It is also helpful to note that, if the DSH Payment was associated with the prior Federal Fiscal Year, it would fail to serve its intended purpose. Dispersing a Payment at the beginning of the current Federal Fiscal Year to compensate for underpayment in the previous Federal Fiscal Year might reduce the amount of losses a hospital had to absorb at the end of the Federal Fiscal Year, but it would do nothing to ease its financial burden or subsidize its operating costs in the interim. By contrast, dispersing a Payment at the beginning of the current Federal Fiscal Year for use during that Year gives hospitals another source of funds with which to conduct daily operations. If the DSH Payment is dispersed at the beginning of the Federal Year and is intended for use during that period, then it is properly classified as a post-Transition Date asset, which the Settlement Agreement clearly awards to the Knox Parties.

Pacer, however, insists that the DSH Payment should be awarded to it as either an account receivable or a payment earned before the Transition Date. Pacer presents three arguments in support of its assertion, none of which the Court finds persuasive. First, Pacer argues that a right to payment accrued because its patient care statistics from its management era were used to determine whether the Hospital qualified as a disproportionate share institution, and if so, how much funding it should receive for the next Federal Fiscal Year. While the services they provided had an impact on the Payment at issue, the Payment itself is not intended to compensate Pacer for those services. Such an argument is not only inconsistent with Congress' intent, it is at odds with Pacer's own characterization of DSH Payments as "additions or supplements to the system of prospective payments and reimbursements that constitute the Medicare/Medicaid system of payments."

8

Second, Pacer attempts to analogize these facts to those presented in *In re CHA Hawaii*, in which the court held that supplemental Medicare/Medicaid funds paid to the Chapter 11 debtor, a disproportionate share hospital, were not part of the secured creditor's cash collateral. 426 B.R. 828, 834 (Bankr.D.Haw. 2010). The Security Agreement at issue in that case stated that the creditor's security interest attached to "all personal property and other assets, excluding accounts and identifiable proceeds of accounts." *Id. In re CHA Hawaii* may seem on point at first glance, but Pacer fails to mention that the creditor "did not dispute that the Medicare payments are proceeds of accounts and are not [part of the creditor's] cash collateral." *Id.* Since there was no dispute about the nature of Medicare payments, the court simply accepted the parties' characterization of Medicare funds as proceeds of accounts. *Id.* From there, the court reasoned that DSH Payments are meant to supplement Medicare payments, so they must also be excluded from the creditor's cash collateral. *Id.*

Pacer urges this Court to follow that non-binding precedent and hold that the DSH Payment is an account receivable because the *CHA Hawaii* court made a similar finding. While that court also had to determine ownership of the DSH Payment under the terms of an agreement between the parties, it was not required to delve into the nature of DSH Payments. Rather than explaining *why* Payment constitutes proceeds of accounts, the court simply accepted the debtor's undisputed characterization of the Payment. Since the very point stipulated in *In re CHA Hawaii* is at the core of Pacer's dispute with the Knox Parties, this case provides no instructive legal analysis to guide the Court in determining the nature of DSH Payments.

Third, Pacer argues that the parties intended to bestow only a "limited right to receive any pre-transition date underpayments–limited to credits for underpaid Medicare/Medicaid reimbursements." (Doc. # 5 at 11).   Therefore, the bankruptcy court's determination that the parties intended to allocate the benefits and burdens of Medicare/Medicaid ownership, including the DSH Payments, to the Knox Parties was overbroad and unfairly limited Pacer's rights.  (*Id.*).   While the primary object in construing a contract is to give effect to the intentions of the parties, "the fact that one party may have intended different results...is insufficient to construe a contract at variance with its plain and unambiguous terms."  *Cantrell Supply Co. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002).   This Court finds nothing on the face of the Agreement that is inconsistent with the bankruptcy court's interpretation of the parties' rights.   However, even if the bankruptcy court's interpretation did alter the parties' rights to pre-Transition Date assets, it would not change the Court's opinion that the DSH Payment is a *post*-Transition Date asset that the Agreement clearly awards to the Knox Parties.

The Court comes to the same conclusion when applying Medicaid law to the matter at hand.  Like the federal Medicare statute, the Kentucky Medicaid statute provides for DSH Payments to be made to acute care hospitals.  Ky. Rev. Stat. Ann. § 205.640.  Hospitals gather patient care data and send it to the Cabinet for Health and Family Services on a quarterly basis.  *Id.*  All data for care provided during the state fiscal year, which runs from July 1st to the following June 30th, must be submitted no later than August 15th of each year.  *Id.*  The Cabinet then uses the data to calculate the amount of the hospital's annual payment by October 1st.  *Id.*  While Medicaid DSH Payments are calculated and dispersed in much the same way as Medicare DSH Payments, the Medicaid statute unequivocally

10

states what the Medicare statute leaves silent.  According to Kentucky Administrative Regulations, "[a] DSH distribution shall...[b]e a *prospective amount.*  For example, a DSH distribution made to a hospital in October 2007 shall cover the state fiscal year beginning July 1, 2007 and ending June 30, 2008."[1] 907 Ky. Admin. Regs. 10:820 (emphasis added).

On appeal, Pacer advances only one argument against the applicability of this language.  Pacer reasons that the Kentucky regulatory scheme pertaining to disproportionate share payments is flawed because it "improperly alters or amends the language of the enabling statute."  (Doc. # 7 at 8).  Pacer seeks to support this argument by creating an inconsistency between various provisions of Kentucky's disproportionate share statute, which use the past tense, and the administrative regulations that speak so clearly of a prospective payment.  (*Id.* at 8-9).  However, this argument is unpersuasive because, aside from this alleged grammatical inconsistency, there are no provisions of the statute and regulations that clearly conflict.  Such reasoning is insufficient to conclude that an entire regulatory scheme is flawed and it certainly does not change this Court's finding that the DSH Payment is prospective, and therefore, a *post*-Transition Date asset that belongs to the Knox Parties.

Rather than parsing the fine line that the parties have attempted to draw between "accounts receivable from Medicare/Medicaid payors existing or to be generated before the Transition Date" and "credits for underpayment of Medicare/Medicaid reimbursements," the Court finds that the Section of the Agreement disposing of pre-Transition Date assets does

---

[1] According to this regulation, the October 2012 DSH Payment covered the state fiscal year beginning July 1, 2012 and ending June 30, 2013. The Knox Parties concede that Pacer is entitled to a portion of the DSH Payment for the 15 days that it operated the Hospital.  (Doc. # 1-3 at 3).  This analysis focuses on the funds applicable to the remainder of the state fiscal year.

not control at all.  Instead, it looks to the clause of the Agreement specifying that  "[t]he Knox Hospital Corporation shall have exclusive ownership of all accounts receivable generated by the Knox County Hospital on or after the Transition Date."  (Bk. Doc. # 238 at 24).  Based on its examination of Medicare and Medicaid law, the Court concludes that the DSH Payment at issue is a post-Transition Date asset because it was paid after the Transition Date and does not relate back to specific services that Pacer provided prior to the Transition Date. More importantly, the DSH Payment is a prospective payment intended to subsidize Hospital operations during the current fiscal year. Since the Agreement allocates post-Transition Date assets to the Knox Hospital Parties, this Court concludes that the bankruptcy court properly awarded the DSH Payment to the Knox Parties.

### III.  Conclusion

Accordingly, for the reasons set forth herein, the decision of the bankruptcy court is hereby **AFFIRMED**.

This 26th day of September, 2013



Signed By:

*David L. Bunning*

**United States District Judge**

G:\DATA\Opinions\London\13-84 MOO Bankruptcy Appeal.wpd

12